# United States Court of Appeals
## For the First Circuit

No. 04-1619
No. 04-1664

BENJAMIN A. BUCCI, Individually and as Assignee of
N.E.C.N., Inc. d/b/a The Industry,

Plaintiff, Appellant/Cross-Appellee,

v.

ESSEX INSURANCE COMPANY,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

James D. Poliquin, with whom Thomas S. Marjerison, Lance E.
Walker, and Norman, Hanson & DeTroy, LLC were on brief, for
Benjamin A. Bucci.
Jonathan M. Dunitz, with whom Michelle Allott and Friedman,
Gaythwaite, Wolf & Leavitt were on brief, for Essex Insurance
Company.

January 5, 2005

**LYNCH**, **Circuit Judge**.  Benjamin Bucci was injured in an attack outside a Portland, Maine nightclub called The Industry.  In state court, he sued the club and then settled with it, taking an assignment of the club's claims against its insurer, Essex Insurance Company ("Essex").  A stipulated judgment was entered against The Industry.  Before settling with Bucci, the club had asked Essex to defend and to indemnify it; Essex declined both requests.  Essex disclaimed coverage, based on an exclusion in the policy for "any claim, suit, cost or expense arising out of assault and/or battery" ("assault/battery exclusion").

Bucci, individually and as assignee of The Industry, then sued Essex in a state case; the case was removed to federal court.  Bucci won on his claim that Essex had a duty to defend on a motion for partial summary judgment.  After a bench trial, Bucci lost on the claim that Essex had a duty to indemnify.  Each side appeals.

Essex's appeal from the award on breach of its duty to defend primarily involves whether Maine has adopted a "but for" interpretation of an assault/battery exclusion, and whether Bucci was properly awarded attorney's fees for being forced to bring the claim for breach of the duty.

Bucci's appeal from the denial of his indemnity claim raises interesting issues under Maine law and a subsidiary federal evidence law issue.  The first has to do with whether under Maine law an insurer that has violated its duty to defend is limited in

-2-

presenting a defense that it nonetheless had no duty to indemnify. Bucci argues that he was rendered unconscious instantaneously, and absent evidence from a witness to the attack, the insurer, which bears the burden on the exclusion, cannot prove there was a battery, that is, a hitting with the intent to cause harm. In support, Bucci also argues that the court erred under Fed R. Evid. 803(4) by considering evidence from Bucci's medical records.

We reject both parties' arguments. Each side was given a conscientious and fair hearing by the district judge, who committed no errors of law, and we affirm the judgment.

## I.

The facts and the history of the proceedings are based on the record and the district court's two opinions in this case, Bucci v. Essex Ins. Co., 287 F. Supp. 2d 75 (D. Me. 2003) ("Bucci I"), and Bucci v. Essex Ins. Co., 323 F. Supp. 2d 84 (D. Me. 2004) ("Bucci II").

On the night of December 22-23, 2000, Bucci was waiting in line outside The Industry, a nightclub in Portland, Maine, when an unknown assailant hit him on the back of the head. Bucci II, 323 F. Supp. 2d at 86. He remembers the first blow to the back of his head, but then lost consciousness. Id. With the exception of one split second in the ambulance, he has no memory of what happened after that first blow until he arrived at the hospital. Id. at 87. He cannot describe the assailant. Id. Bucci suffered

-3-

significant injuries to his face and required reconstructive surgery. His medical records from December 23, 2000 indicate that he was "hit," "kicked," and "punched" in the face. Id.

In early 2001, Bucci notified The Industry that he intended to sue it for his injuries. The Industry was insured at the time under a standard commercial general liability ("CGL") policy issued by Essex. Bucci I, 287 F. Supp. 2d at 77. The Industry requested that Essex defend and indemnify it under the terms of the CGL policy. Id. On June 29, 2001, Essex denied it had any duty to defend or to indemnify The Industry based on the assault/battery exclusion in the policy:

> The coverage under this policy does not apply to any claim, suit, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any Insured, Insured's employees, patrons or any other person. Nor does this insurance apply with respect to any charges or allegations of negligent hiring, training, placement or supervision.

Id.

Bucci then filed suit against The Industry in Maine Superior Court. In his complaint, Bucci alleged the following:

> 10. While waiting in line at the club, the Plaintiff was viciously attacked by a person known to agents and employees of the Defendant.
> 11. The Plaintiff was repeatedly kicked in the head by a person known to agents and employees of the Defendant causing serious

-4-

permanent injuries that required surgery and hospitalization.

12. Despite this vicious assault, employees and agents of the Defendant failed to take reasonable measures to assist the Plaintiff or to prevent the assault on the Plaintiff.

13. Following this vicious assault, agents and employees of the Defendant assisted the individual who assaulted the Plaintiff by telling him to run inside The Industry to avoid the Portland Police Officers responding to the assault.

The complaint asserted legal claims for negligence, negligent security, negligent supervision and training, negligent infliction of emotional distress, concerted action, spoliation of evidence, and punitive damages. The Industry forwarded a copy of the complaint to Essex and again requested defense and indemnity. Essex again denied the request on August 29, 2001.

On July 17, 2002, Bucci and The Industry, each represented by counsel, settled the underlying action and stipulated to a judgment of $200,000. Id. In consideration for an agreement by Bucci not to execute $193,000 of the judgment against The Industry, The Industry assigned its rights under the insurance policy to Bucci. Id. Thus, The Industry paid Bucci only $7,000. The Industry also incurred $8,800 in attorney's fees for its defense of the action. On July 23, 2002, the state trial court entered judgment pursuant to the parties' stipulations.

Bucci also successfully put in a claim to the Maine Victim's Compensation Board, asserting he was the victim of a violent crime.

On March 6, 2003, Bucci filed a complaint in Maine state court against Essex, alleging that Essex was in breach of its contract with The Industry by violating its duties to defend and to indemnify The Industry against Bucci's suit, and that Essex had engaged in unfair settlement practices. Bucci sought to recover $200,000, the amount of the stipulated judgment entered against The Industry, plus attorney's fees, costs, and interest. On April 7, 2003, Essex removed the case to the U.S. District Court for the District of Maine.[1]

Bucci and Essex each moved for partial summary judgment on the issue of whether Essex violated its duty to defend. On October 23, 2003, the district court granted Bucci's motion for partial summary judgment and denied Essex's motion. Bucci I, 287 F. Supp. 2d at 76. The district court determined that the assault/battery exclusion did not exclude claims for bodily injury resulting from conduct occurring after an alleged assault. Id. at 79. Because Bucci's complaint in the underlying action included allegations of The Industry's conduct which purportedly caused Bucci injury after the alleged assault, the district court held that Essex did violate its duty to defend The Industry under the insurance policy. Id. The posture of the case at that point was

_____

[1]Federal diversity jurisdiction under 28 U.S.C § 1332 exists in this case since Bucci is a citizen of Maine and Essex is a Delaware corporation with its principal place of business in Virginia, and the amount in controversy exceeds $75,000.

that if there were a duty to indemnify, it had to arise from conduct by The Industry after the assault. The court left for trial the determination of whether Essex violated the separate duty to indemnify and the amount of damages for the violation of the duty to defend. Id. at 80.

At the half-day bench trial conducted on December 5, 2003, the central issue was whether all of Bucci's injuries resulted from the attack and so fell within the policy's assault/battery exclusion. Brian Hanson, the president of The Industry, testified about the history of the law suit by Bucci against The Industry and Essex's refusal to defend the suit. Kimberly Payne, a senior claims examiner at Essex, testified that she denied the request to defend after she received the notice of claim and spoke with Hanson's counsel, Hanson himself, and Bucci's counsel on June 29, 2001. From the information contained in the notice of claim and the conversations, she determined that Bucci's injuries were precluded from coverage by the assault/battery exclusion in the policy. She also testified that after Bucci commenced the suit against The Industry, The Industry sent a copy of the complaint to her. And on August 29, 2001, after consulting local counsel, she again denied coverage based on her determination that the assault/battery exclusion precluded coverage. She testified that while Essex did not have an official definition for the terms "assault and battery" used in the exclusion, she

understood it to mirror the civil definition for the tort of "assault and battery" in the state in which the claim arises, that is, "an intentional hitting or striking or harm in some way" (emphasis added).

Bucci also testified, describing in detail the nature of his injuries, the medical treatment he required, and what he could remember of the events on the night of December 22-23, 2000. Bucci replied "no" when asked if he was disputing that he was assaulted outside The Industry. Bucci testified that he remembered being hit "[i]n the back of the head" by the unknown assailant. He also said that he knew he lost consciousness and that the ambulance crew "tr[ied] pretty hard to get [him] awake and [he] remember[ed] a split second being in the ambulance." Bucci testified that after he woke up in the hospital, he "knew that [his] face was broken. . . . [He] was in shock and [he] was severely cold and [he] needed blankets and [was] extremely confused as to what happened." He explained that his face "was caved in and everything over here was pushed in, everything over here and on this side was broken." Bucci testified that his jaw was broken and he could not eat anything or talk. Bucci testified that he could not tell whether the physical injuries he suffered resulted from the assault. He testified that he had never told a health care provider that his injuries were caused by anything other than the assault.

On April 8, 2004, the district court issued its rulings. See Bucci II, 323 F. Supp. 2d at 86. The district court found that all of Bucci's injuries resulted from the attacker's actions, and not from later conduct by The Industry. Id. at 91-92. Thus, the district court held that Essex did not violate its duty to indemnify The Industry because the entire stipulated judgment in the underlying state tort action was based on injuries for which coverage was excluded. Id. at 92. In addition, the court awarded $7,000 to Bucci (as The Industry's assignee) as damages for Essex's violation of its duty to defend, as well as "reasonable attorney fees" attributable to his claim for Essex's violation of the duty to defend.[2] Id.

Both parties filed timely appeals to this court. We address them in turn.

## II. Essex's Appeal

A. Essex's Violation of the Duty to Defend

Essex contends that the district court erred when it held that Essex violated the duty to defend the underlying action because the complaint contained claims for injuries resulting from The Industry's conduct after the attack. See Bucci I, 287 F. Supp. 2d at 79. Specifically, the court applied the Maine rule of

---

[2]According to the settlement agreement between Bucci and The Industry, The Industry is entitled to the first $7,000 of any amount that Bucci may recover from Essex to reflect The Industry's payment of $7,000 to Bucci.

construction that any ambiguity must be construed against the insurer.  Id. at 79.  The court either found no ambiguity, and/or ruled that assuming the exclusion was ambiguous, it must be read against Essex.  See id.

We review the district court's finding that Essex had a duty to defend de novo both because it was resolved on summary judgment and because under Maine law "[w]hether an insurer has an obligation to defend its insured against a complaint is a question of law."  Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1312 (Me. 1998) (citing N. Sec. Ins. Co. v. Dolley, 669 A.2d 1320, 1322 (Me. 1996)).  Further, the question of whether there is an ambiguity in the contract is itself a conclusion of law, reviewed de novo. Crowe v. Bolduc, 334 F.3d 124, 134 (1st Cir. 2003); Geyerhahn v. U.S. Fidelity & Guar. Co., 724 A.2d 1258, 1261 (Me. 1999).

Maine has consistently adhered to a pleading comparison test to determine whether there is a duty to defend; that is, Maine resolves the question of "whether there exists a duty to defend . . . by comparing the complaint with the terms of the insurance contract."  Elliott, 711 A.2d at 1312; see Found. for Blood Research v. St. Paul Marine and Fire Ins. Co., 730 A.2d 175, 177 (Me. 1999) ("It is black letter law in [Maine] that an insurer's duty to defend is determined by comparing the allegations in the underlying complaint with the provisions of the insurance policy.").  This is the case even when the undisputed facts show

the injury in question was not covered by the policy.  Elliott, 711 A.2d at 1312.

Under this comparison test, the insurer has a duty to defend if the underlying complaint discloses a "potential or a possibility" for liability within the policy's coverage.  Id. (emphasis added).  Significantly, "[t]he duty to defend is broader than the duty to indemnify, and an insurer may have to defend before it is clear whether there is a duty to indemnify." Commercial Union Ins. Co. v. Royal Ins. Co., 658 A.2d 1081, 1083 (Me. 1995).  Maine requires that insurance policies be "interpreted most strongly against the insurer."  Baybutt Constr. Corp. v. Commercial Union Ins. Co., 455 A.2d 914, 921 (Me. 1983), overruled on other grounds, Peerless Ins. Co. v. Brennon, 564 A.2d 383 (Me. 1989).  "Any ambiguity must be resolved in favor of a duty to defend."  Mass. Bay Ins. Co. v. Ferraiolo Constr. Co., 584 A.2d 608, 609 (Me. 1990).

Essex argues that the phrase "arising out of assault and/or battery" in the policy should be read broadly and urges us to adopt a "but for" test, since "but for" the attack, there would have been no post-attack injuries.  In essence, Essex argues that even if the conduct of the employees of The Industry after the attack caused identifiable injury separate in kind from the injuries from the attack or a worsening of the injuries from the attack, the exclusion applies because these injuries would not have

-11-

occurred if there had been no battery. The theory is not frivolous and Essex points to cases from elsewhere (or, as they would say in Maine, "from away") which support its reading. See, e.g., Mark McNichol Enters., Inc. v. First Fin. Ins. Co., 726 N.Y.S.2d 828, 829 (N.Y. App. Div. 2001).

Essex points to only one Maine case, Mallar v. Penn-Am. Ins. Co., 837 A.2d 133 (Me. 2003). In Mallar, the court held that where a pub patron witnessed the murder of the bartender and obtained a judgment against the pub for negligent infliction of emotional distress as a result of the incident, the pub's insurer nonetheless had no duty to indemnify the pub under the policy's "assault and battery exclusion" because "witnessing the murder was unquestionably the cause-in-fact" of the patron's injury (as opposed to the injury being independently caused by the bartender's actions in getting herself killed). Id. at 135.

Essex argues that Mallar focused on the operative facts which caused the injury to determine the insurer's obligation, and here, the "operative fact" was the assault. Mallar cites to Winnacunnet Coop. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 84 F.3d 32, 37 (1st Cir. 1996), which applied New Hampshire law to an assault/battery exclusion clause, and Essex relies on that case to support its position. Winnacunnet, however, involves the mirror image of this case. It stands for the proposition that negligent activities before an assault which do

-12-

not cause any injuries <u>independent</u> of the assault fall within an assault/battery exclusion and are not covered by a policy that contains such an exclusion. <u>Id.</u> at 35. <u>Mallar</u> explains <u>Winnacunnet</u> as a case where "although the plaintiffs allocated blame elsewhere, their alleged injuries nonetheless originated from a murder." <u>Mallar</u>, 837 A.2d at 135. However, this case involves allegations of negligent activities <u>after</u> an assault which allegedly caused (or exacerbated) injuries <u>independent</u> of (or in addition to) the assault. <u>Mallar</u> does not establish the reading Essex urges.

In interpreting insurance contracts, Maine law does not use the "but for" test advocated by Essex. <u>See, e.g.</u>, <u>Pelkey</u> v. <u>Gen. Elec. Capital Assurance Co.</u>, 804 A.2d 385, 387-89 (Me. 2002) (An insurance policy which limited coverage to injuries due to accidents "directly and independently of all other causes" did not preclude coverage for injuries from an accidental fall, though "but for" the contribution to the injuries from pre-existing disease, the loss would not have occurred.). We see no reason to do so here.

Under Maine law, "an insurer may have to defend before it is clear whether there is a duty to indemnify," <u>Commercial Union Ins. Co.</u>, 658 A.2d at 1083. The lack of clarity referred to by the Maine Law Court, in our view, involves lack of legal clarity as

well as lack of factual clarity.  See Found. for Blood Research, 730 A.2d at 177.

B.  Award of Attorney's Fees Against Essex

Essex also appeals from the district court's award of attorney's fees attributable to Bucci's being forced to prosecute a claim against Essex for its failure to defend Bucci's underlying action against The Industry.[3]

Under Maine law, although a trial court's award of a sum for attorney's fees is reviewed for abuse of discretion, the question of whether a trial court has authority to award attorney's fees is a question of law reviewed de novo.  Maine Mut. Fire Ins. Co. v. Gervais, 745 A.2d 360, 362 (Me. 1999); Gibson v. Farm Family Mut. Ins. Co., 673 A.2d 1350, 1352, 1354 (Me. 1996).  Usually, under the American Rule, attorney's fees are not awarded to the winning party in a common law action.  See Gibson, 673 A.2d at 1354.  There is a common law exception which permits an award of attorney's fees incurred in establishing an insurer's duty to defend.  See id.

Such an award is restricted to cases "when the duty to defend is clear, pursuant to prevailing Maine law, from the policy and the pleadings of the suit filed against the insured."  Id. at 1355.  It appears from Gibson that the issue of whether the duty

---

[3]Essex does not contest the $7,000 award of contract damages, which was based on its violation of the duty to defend.

-14-

was clear is subject to de novo review.  Id.  Gibson also explained that "[i]n determining whether a duty to defend is clear, the insurer will be held to recognize Maine law prevailing at the time of the insured's request for defense."  Id.  "Given the possible existence of any legal or factual basis for payment under a policy, an insurer's duty to defend should be decided summarily in favor of the insured."  Id. at 1352 (emphasis added).

Essex relies on Northland Ins. Cos. v. Coconut Island Corp., 961 F. Supp. 20 (D. Me. 1997), to argue that there was no clear duty.  In Northland, the plaintiff in the underlying action sued a guesthouse for injuries she sustained from a sexual assault by an employee of the guesthouse who entered her room without her consent.  Id. at 21.  The guesthouse's CGL policy contained an exclusion for "bodily injury" that arises "out of an assault and battery" and also provided no coverage for "personal injuries," defined as "injury, other than 'bodily injury,' arising out of . . . wrongful entry into, or invasion of the right of private occupancy of . . . a room, dwelling, or premises."  Id. at 22.  The district court granted the insurer's summary judgment motion, holding that the insurer had no duty to defend the underlying action, because all of the plaintiff's allegations in the underlying complaint were either bodily injuries that resulted from the sexual assault or "personal injuries" caused by negligence,

negligent hiring and supervision, or intentional infliction of emotional distress. Id.

Northland is not helpful to Essex. To the extent that Essex is arguing that some of Bucci's claims may be read to allege "personal injuries," the argument fails because unlike the policy in Northland, Essex's policy does provide coverage for "personal injuries." Northland also cannot be read to state that Essex had no duty to defend with respect to the post-attack allegations here.

We affirm the district court's award of attorney's fees.

## III. Bucci's Appeal From Ruling that Exclusion Applies

### A. Essex's Assertion of Nonconverage as a Defense After Violation of Duty to Defend

Bucci argues, relying on language in two Maine cases, that because Essex was in breach of its duty to defend, it could not argue at trial that the injuries Bucci received were within the assault/battery exclusion, and as a result, it could not argue that it had no duty to indemnify The Industry. See Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1314 (Me. 1998); Marston v. Merchants Mut. Ins. Co., 319 A.2d 111, 114 (Me. 1974).

Stated broadly, Bucci's argument is that an insurer which is in breach of a duty to defend may not subsequently argue that there was no duty to indemnify. As so stated, Maine law has flatly rejected the argument. As the court said in Elliott, "An insurer that breaches its duty to defend . . . is not estopped from asserting noncoverage as a defense in a subsequent action brought

-16-

by the insured or the insured's assignee." Elliott, 711 A.2d at 1313. The court observed that the argument would impermissibly collapse the separate duties to defend and to indemnify into one another:

> [I]f an insurer who refuses to defend were estopped from asserting the lack of coverage as a defense in a subsequent action, then the insurer's duty to indemnify would be coextensive with its duty to defend. [The Maine Law Court], however, ha[s] repeatedly stated that an insurer's duty to indemnify is independent from its duty to defend and that its duty to defend is broader than its duty to indemnify.

Id.

Elliott adopted the rule articulated by the Massachusetts Supreme Judicial Court in Polaroid Corp. v. Travelers Indemnity Co., 610 N.E.2d 912, 922 (Mass. 1993) ("The statement made by some courts that the insurer is estopped to deny liability is simply a conclusion and fails to recognize that no estoppel is involved in any traditional sense because, in refusing to defend a claim, an insurer makes no misrepresentation on which the insured relies to its detriment."). Elliott, 711 A.2d at 1313. Because Polaroid treated the matter as one of contract law, the question of whether contract damages should include the amount of the underlying settlement became a question of whether the amount of the settlement represented damages which "cannot be reasonably prevented and arise naturally from the breach, or [which were] reasonably contemplated by the parties." Polaroid, 610 N.E.2d at

-17-

921 (quoting <u>Delano Growers' Coop. Winery</u> v. <u>Supreme Wine Co.</u>, 473 N.E.2d 1066, 1075 (Mass. 1985)).  Importantly, the <u>Polaroid</u> court went on to say: "If an underlying claim . . . is not within the coverage of an insurance policy, an insurer's improper failure to defend that claim would not ordinarily be a cause of any payment that the insured made in settlement of that claim (or to satisfy a judgment based on that claim)."  <u>Id.</u>  We understand this to be the approach Maine has adopted.[4]

The question of whether breach of an insurer's duty to defend precludes the insurer from asserting a defense to indemnity involves different approaches and interests.  Other states have decided this public interest question differently.  <u>See</u> 22 Eric Mills Holmes, <u>Holmes' Appleman on Insurance</u> § 136.8, at 56 (2d ed. 2003) ("Another consequence of the insurer's refusal to defend [in some states] is that the insurer may be estopped from denying coverage under the indemnification provisions of the policy.  Thus when the insurer refuses to defend, it is bound by the judgment

---

[4]Indeed, when a federal district court, in 1998, read an earlier Maine case, <u>Cambridge Mut. Fire Ins. Co.</u> v. <u>Perry</u>, 692 A.2d 1388 (Me. 1997), as creating a rule that an insurer's wrongful failure to defend results in the insurer's waiver of the right to subsequently litigate the indemnification issue, <u>see</u> <u>Anderson</u> v. <u>Va. Sur. Co.</u>, 985 F. Supp. 182, 189-90 (D. Me. 1998), the Maine Law Court expressly disavowed that broad reading.  <u>See</u> <u>Elliott</u>, 711 A.2d at 1314 n.3.  In a post-<u>Elliott</u> case, a federal district court perceptively recognized that <u>Elliott</u>'s rejection of that broad reading may be based in part on Maine's recognition that key facts bearing on the duty to indemnity may well not have been resolved in an earlier settlement.  <u>Boise Cascade Corp.</u> v. <u>Reliance Nat'l Indem. Co.</u>, 99 F. Supp. 2d 87, 98 n.14 (D. Me. 2000).

entered against the insured."). The cases expressing that different policy cited in the treatise are often based on the estoppel theory. See, e.g., Aetna Cas. & Sur. Co. v. Coronet Ins. Co., 358 N.E.2d 914, 917 (Ill. App. Ct. 1976).

But Maine has expressly rejected that theory of waiver or estoppel. Elliott, 711 A.2d at 1313. Rather, Maine has adopted the view that an insurer who has wrongfully refused to defend is in breach of contract and is subject to contractual remedies for the breach. Id.

The rub is what the Maine Law Court meant when it said in Elliott that the insurer "is also bound by the default judgment as to any factual issues that might have been litigated in the underlying negligence action." Id. at 1314. Elliott cites to Marston, which said, "[A]t least . . . in any action in which there is an allegation in the complaint which would establish liability within the coverage of the policy even though there are other allegations as to liability outside the coverage of the policy, a general verdict with no special findings of fact is binding on the insurer as to its liability under the insurance policy." Marston, 319 A.2d at 114. Both Elliott and Marston, unlike the case here, involved default judgments entered below.

Bucci seizes on this language from Elliott to argue that Essex could have raised its exclusion argument based on the battery in the underlying case between Bucci and The Industry, and because

-19-

it failed to do so, it is now precluded from doing so. Given the complexity of the law in this area and the statement in <u>Elliott</u> that an insurer which is in breach of its duty to defend is not precluded from asserting noncoverage as a defense to an indemnity action, <u>Elliott</u>, 711 A.2d at 1313, we very much doubt the sentence in question can be read in the way Bucci urges. The area of law concerning the preclusive effect on an insurer in breach of its duty to defend is complicated, and the Maine Law Court has not been presented with cases which have permitted it to resolve the complexities.

<u>Elliott</u> made reference to the complexities. <u>See</u> <u>Elliott</u>, 711 A.2d at 1313. The insurance law treatises describe a variety of contexts in which the issue of preclusive effect on an insurer is raised and the variety of exceptions that exist even in courts which follow such a rule of preclusion. <u>See</u> 14 Lee Russ and Thomas F. Segalla, <u>Couch on Insurance</u> §§ 202:8-202:12 (3d ed. 1999). For example, <u>Couch</u> lists exceptions to the rule binding insurers in breach of a duty to defend to judgments in the underlying action when, <u>inter alia</u>, (1) the underlying action has been settled or there is a consent judgment and the settlement amount was not reasonable, or not entered into in good faith, <u>id.</u> § 202:9, at 202-35; (2) the underlying judgment was procured by fraud or collusion of the insured and the injured party, <u>id.</u> § 202:12, at 202-42; (3) the question of coverage turns on facts which were not essential to

-20-

the underlying judgment of liability, id. § 202:12, at 202-43; (4) there is a serious conflict of interest between the insurer and insured, id. § 202:12, at 202-43; and (5) the insured cannot show that it was worse off as to indemnity for breach of the duty to defend, id. § 202:12, at 202-44.

Indeed, the Couch treatise makes several observations. Most pertinent is that "[t]he judicial decisions on this matter generally reflect the principle that a court will not create coverage in those situations where coverage does not exist." Id. § 202:12 at 202-45. Another is that "public policy considerations . . . disfavor fraudulent or collusive settlements, such as those in which an insured concedes liability in situations where it is not liable, and in which the injured third party is effectively awarded damages in excess of the value of actual injuries." Id. §202:9, at 202-36. Maine has not yet explored all of these questions, but certain principles guide the way.

First, to the extent Maine has any form of a rule binding insurers in breach of a duty to defend to an underlying judgment, there are, we conclude, limits to the binding effect under the rule. Elliott limited the binding effect of the default judgment to issues which were or "might have been litigated" in the underlying action by the injured person for recourse to the policy. Id. at 1314. We view this broad language in Elliott ("might have been litigated") as likely limited by the rule articulated in Am.

-21-

Policyholders' Ins. Co. v. Cumberland Cold Storage Co., 373 A.2d 247, 250-51 (Me. 1977), that where there is a duty to defend "the indemnification obligation depends upon the theory under which judgment is entered in the underlying damage actions." Id. at 251 (emphasis added). Further, we do not understand Maine law to depart from the usual rule that any binding effect from an underlying judgment is only as to facts which were essential to the underlying judgment. See 14 Couch on Insurance, § 202:12, at 202-41. That more limited understanding is articulated in the Polaroid case, whose rule Elliott cited favorably. See Elliott, 711 A.2d at 1313; Polaroid, 610 N.E.2d at 921 n.20.

Second, it is also clear under Maine law that a non-defending insurer in breach of its duty to defend may nonetheless challenge, at the least, the reasonableness or good faith of the underlying settlement. Cambridge Mut. Fire Ins. Co., 692 A.2d at 1391.

Third, Maine law allows declaratory judgment actions by insurers who seek a determination that they have neither defense nor indemnity obligations as to underlying actions against their insureds. Am. Policyholders' Ins. Co., 373 A.2d at 250. Should summary judgment be appropriate, the insurer may obtain a judgment of no obligation to indemnify even before judgment has entered in the underlying action. Id. at 250 n.2. Essex did not follow that path here, nor is there a suggestion that it was required to do so.

-22-

Indeed, Maine law recognizes that a potential conflict of interest between insurers denying coverage and insureds may be such as to warrant refusing to let an insurer intervene in the underlying action between the plaintiff and the insured. See Donna C. v. Kalamaras, 485 A.2d 222, 225 (Me. 1984). The Maine Law Court was explicit that an insurer need not intervene to protect itself from the so-called Marston rule. Id. at 224-25. Thus Maine does not seem to have adopted a rule that an insurer must bring a declaratory judgment action or attempt to intervene in the underlying action and is in peril of giving up an indemnity defense if it fails to do so.

In the end, we conclude that the sentence in Elliott does not assist Bucci for several reasons. First, the clear rule under Elliott is that an insurer in breach of a duty to defend is not prohibited from asserting noncoverage as a defense to an indemnity action. Bucci's argument appears to us to be inconsistent with that rule.

Second, we doubt Maine law would inflexibly adopt the rule Bucci desires. Such a rule would encourage collusion (or even fraud) between insureds and injured plaintiffs, as well as inflated settlements, leaving an insurer without a defense of noncoverage. See Airway Underwriters v. Perry, 284 N.E.2d 604, 607-08 (Mass. 1972) (noting an insurer may always avoid a judgment rendered against the insured by showing it was procured by collusion or

-23-

fraud).  All indications are that Maine would not want to encourage collusion or fraud.  See Cambridge Mut. Fire Ins. Co., 692 A.2d at 1391 ("An insurer is liable only if the settlement amount is reasonable and is made in good faith.").

We draw some distinctions between collusion as to claims of negligence and collusion as to claims on which an exclusion from coverage is predicated.  We do not suggest that there was no reasoned basis for a conclusion that The Industry somehow negligently violated a duty of care in not preventing or stopping the assault; the record is simply too bare on the point to make any such determination.  Nor do we suggest that Bucci's injuries were not serious; they were extremely serious and his damages were real.  There is nothing, nonetheless, in the record to support the allegations contained in the complaint that post-attack actions by The Industry caused or contributed to Bucci's injuries, and that was the premise for Bucci's coverage argument.  Bucci's refusal to put on any proof in support of those coverage allegations is telling.  We see no reason why a court would not be free to consider the lack of merit of the only allegations in the complaint on which coverage could possibly be based in considering whether an insurer is precluded from a defense on indemnity.

Third, the rule in Marston, referred to by the sentence in Elliott, 711 A.2d at 1314, has a limited preclusive effect, as we have described.  There is a difference between the issue of

-24-

whether the insured's negligence caused injury to plaintiff and the issue of whether an exclusion (say, for assault and battery) nonetheless precludes coverage even if there was negligence. Here, the factual issue in the underlying action was whether The Industry negligently caused Bucci's injuries. In the underlying tort action, all that was required to be proven was negligence causing injury; not that the touching causing injury was intentional. See Cambridge Mut. Fire Ins. Co., 692 A.2d at 1390-91. It was not necessary for the resolution of that underlying claim to determine whether Bucci's injuries were caused by battery, the issue on which insurance coverage turned.

The trial court correctly rejected Bucci's argument.

B. Sufficiency of the Evidence

As the case between Bucci and Essex was framed for trial after the partial summary judgment motions, the issue was whether there was evidence that any of the injuries Bucci suffered were outside the exclusion, as the complaint had alleged. See Bucci I, 287 F. Supp. 2d at 79. That is, the question was whether Bucci had suffered any injuries not caused by the incident itself but by the conduct of The Industry staff afterwards. At trial, Bucci offered no evidence of any such injury resulting from conduct outside of, and after, the incident; instead, he relied on the fact that the insurer had the burden of proving the exclusion.

-25-

On appeal, Bucci's theory has subtly shifted. He now argues that the insurer never met its burden of showing that the injuries he suffered were from an assault and battery, because no one can show that his unknown assailant acted intentionally. The argument builds on several points: that the district court applied the incorrect legal standard; that a fact finder could not reasonably infer from the degree of injury that the injury was intentionally inflicted; that the medical records (which supplied details concerning the nature of the injury and the statements that indicated he was hit in the face) were inadmissible under Rule 803(4) because the declarant was unknown; and that the error in admitting the medical records was prejudicial. The arguments have a certain air of unreality, especially given the allegations of the complaint, which described Bucci as a victim of assault and battery.[5]

_____

[5]The complaint in Bucci's civil suit against The Industry, though not admitted into evidence for the truth of the matter asserted therein, was nonetheless admissible as a party admission and susceptible to judicial notice. See Rodi v. S. New Engl. Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.") (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990)). As an ordinary admission, these allegations in the complaint are not rebutted by any evidence introduced by Bucci.

Litigants are under an obligation not to allege facts that have no evidentiary support. See Gonzalez v. Walgreens Co., 918 F.2d 303, 305 (1st Cir. 1990) ("[A] pleading in one case is not a conclusive judicial admission in a later one, [but] it is treated as an ordinary admission which can be contradicted by other evidence." (quoting United States v. Raphelson, 802 F.2d 588, 592 (1st Cir. 1986)) (alterations in Gonzalez); see also Fed. R. Civ.

As to the insufficiency argument, an appellate court construes all evidence "in the light most hospitable to the verdict" and the evidence will be deemed insufficient only if the record, "viewed from this verdict-friendly perspective and without regard to credibility or weight, is such that reasonable minds could not differ as to the outcome." Muniz v. Rovira, 373 F.3d 1, 4-5 (1st Cir. 2004) (citations omitted).

Bucci's main argument is that there is no evidence that Bucci's injuries were intentionally caused, and thus a battery. The district court inferred the requisite intent from Bucci's severe facial injuries, which were consistent with the theory that he was hit with repeated and violent blows. The court found that "Bucci was hit from behind and then punched or kicked in the face until he sustained severe facial damage." Bucci II, 323 F. Supp. 2d at 91 n.6. That satisfied the court that "Bucci was the victim of a battery." Id.

The district court applied the correct legal standard. "At common law an unlawful touching of the person of another, unpermitted and unprivileged, done with the intention of bringing about a harmful or offensive contact, constituted an assault and battery." Wilson v. State, 268 A.2d 484, 486-87 (Me. 1970). Although there is no direct evidence of intent in this case, given

P. 8(e)(2) and 11(b)(3) (stating factual allegations in pleadings should have evidentiary support or are likely to have such support after investigation).

-27-

that the assailant could not be identified, Maine allows intent to be inferred from the result of the attack. "Absent a rare admission by the party, a party's intent can only be inferred from his physical acts." Mut. Fire Ins. Co. v. Hancock, 634 A.2d 1312, 1313 (Me. 1993). Indeed, Maine has not been particularly receptive to arguments that where a person is unable to recall what happened to cause injury, a court may not infer from other evidence that what happened was a result of intentional conduct. That was exactly the argument the court was asked, and refused, to endorse in Hancock. Id. at 1313 (inferring from evidence of multiple violent blows to victim that the attacker intended to cause injuries). The record supports the trial judge's finding that Bucci was the victim of a battery.[6]

Bucci also testified at trial that he was not disputing the fact that he was "assaulted" outside The Industry. Bucci

---

[6]Bucci testified that he remembered being hit by the first blow from behind. The emergency ambulance report noted that Bucci's left cheek was swelling because he was "struck once in face [with] a fist," and that a witness said that Bucci lost consciousness for "approximately 1 min." The ambulance report also noted that Bucci's lower lip was lacerated. The emergency physician record from the night of December 23, 2000, when Bucci was taken to the emergency room, notes that Bucci was "hit & kicked in [the] face." Bucci's argument that these multiple, repeated violent blows to his body were not intentional but "accidental" or "reckless" is implausible and defies common sense. Cf. Hancock, 634 A.2d at 1313. Further, Bucci's answer to interrogatories, admitted into evidence at trial, explained that he "was brutally attacked within a short distance from Industry employees. . . . [The employees] hid the attacker from the police." (emphasis added).

attempts to minimize this by arguing that he was a layman and did not understand the legal distinction between a "criminal assault" (which may be premised on recklessness alone) and a "civil assault and battery" (which requires intentional acts).  The argument is disingenuous: the common, everyday definition for assault is "a violent physical or verbal attack."  Merriam Webster's Collegiate Dictionary 69 (10th ed. 1993).

Bucci next argues that the district court erred by allowing into evidence Bucci's medical records for the purpose of determining the nature of Bucci's injuries, and inferring from the nature of the injuries that they were intentionally caused.  We review a trial court's evidentiary rulings for abuse of discretion. Walton v. Nalco Chem. Co., 272 F.3d 13, 24 (1st Cir. 2001).

At trial, the district court admitted the medical records de bene, noting Bucci's hearsay and foundation objections.  In its opinion, the district court explained that it excluded the portions from those records that characterize the incident as an "assault," but it admitted descriptions of the specific contacts that caused Bucci's injuries under the statements for medical treatment or diagnosis exception to the hearsay rule, Fed. R. Evid. 803(4). Bucci II, 323 F. Supp. 2d at 87 n.3.  Rule 803(4) provides for the admission of: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general

-29-

character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  Fed R. Evid. 803(4).

Under Rule 803(4), there are three requirements for the admission of out-of-court statements: "(1) the statements must be made for purposes of diagnosis or treatment (2) about (i) medical history (ii) or past or present symptoms, pain, or sensations or (iii) about the inception or general character of the cause or external source thereof (3) insofar as they are reasonably pertinent to diagnosis or treatment."  Danaipour v. McLarey, 386 F.3d 289, 297 (1st Cir. 2004) (footnote omitted).  There is no requirement, either in the text of the Rule, or the case law, that the speaker be the patient himself.  Id.; see also 4 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 803.02[5][d] (8th ed. 2002) ("[S]tatements by bystanders, family members, and others, made for the purposes of treating an injured person and pertinent to that treatment, have often been admitted under Rule 803(4).").  In general, under Rule 803(4), "the declarant's motive to promote treatment or diagnosis is the factor crucial to reliability."  Danaipour, 386 F.3d at 298.

Sometimes, when the declarant of an out-of-court statement is unknown, there is less certainty that the statement was made for the purpose of treating or diagnosing the patient, and the statement itself may not bear the indicia of that purpose.

See, e.g., <u>Stull</u> v. <u>Fuqua Indus., Inc.</u>, 906 F.2d 1271, 1273-74 (8th Cir. 1990) (A statement in the medical record that "[a]pparently, [the plaintiff] . . . jumped off the lawn mower and got his left heel under the law mower" was not admissible under Rule 803(4) because "the word 'apparently' in the hospital record indicates that the statement . . . may not have been made by [the plaintiff]; it may instead represent conjecture on the part of the person filling out the record.").[7]

Here, some statements in the medical records were clearly made by Bucci or a witness to the attack for purposes of medical treatment.[8]  For some of the other statements, the identity of the

_____

[7]<u>See</u> <u>Cook</u> v. <u>Hoppin</u>, 783 F.2d 684, 690 (7th Cir. 1986) (Statements from unknown declarant relating to an alleged "wrestling match" in medical records were not admissible under Rule 803(4) because they "were not of the type medical personnel generally rely on in making a diagnosis and providing treatment."); <u>see also</u> <u>Petrocelli</u> v. <u>Gallison</u>, 679 F.2d 286, 288-91 (1st Cir. 1982) (Statements from unknown declarant in medical records regarding a nerve allegedly severed six months earlier were not admissible under "business records" exception in Fed. R. Evid. 803(6) because there was no indication where this information came from and statements were not diagnostic.).

[8]For example, in the emergency ambulance report, which was filled out by the ambulance crew that transported Bucci to the hospital, is the following: "Patient complained of  [neck] pain after struck once in face [by] a fist.  Witness [said] patient [suffered] loss of consciousness [for] approximately 1 minute. Patient denies spine pain, denies shortness of breath."  The witness who provided a description to the ambulance crew clearly did so for purposes of Bucci's medical treatment.  These statements were made within minutes of the call for help after the attack, adding to the likelihood that they were reliable: the ambulance crew received the emergency call at 1:36 AM, arrived at the scene of the attack at 1:40 AM, and transported Bucci to the hospital at 1:58 AM.

declarant cannot be discerned, but it is nonetheless clear that the statements were made for purposes of medical treatment and were admissible.[9]

The district court carefully and fairly heard Bucci's case. The court's conclusion is unimpeachable.

## IV.

The district court's judgment is **<u>affirmed</u>**. No costs are awarded.

---

[9]For example, in the emergency physician record for Bucci dated December 23, 2000, under the heading "context," the word "direct blow" was circled and the statement "hit & kicked [in the] face" was written underneath; in the triage report filled out by the triage nurse at 2:00 AM on December 23, 2000, the following statement appears under the heading of "primary assessment": "Punched in [left] side of head." It is helpful for a doctor to know this information in evaluating injuries.